IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Tessa Rani Raybourne Gibson Carlisle Childress,<br><br>                               Plaintiff,<br><br>v.<br><br>City of Charleston Police Department Lieutenant Chito T. Walker, Officer Sanders, Officer Koegler, Sargent Ratliff, D-O FNU Wilson, D-O FNU Dallas, and D-O FNU Gant,<br><br>                              Defendants. | Civil Action No.2:13-cv-01225-DCN-MGB<br><br>**REPORT AND RECOMMENDATION**<br>**OF MAGISTRATE JUDGE** |

The Plaintiff, proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983. This matter is before the Court upon Defendants' Motion for Summary Judgement. (Dkt. No. 136.)

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

The Plaintiff brought the instant action on May 6, 2013 and supplemented her Complaint on May 31, 2013. (Dkt. No. 1; Dkt. No. 12.) On October 31, 2014, Defendants filed a Motion for Summary Judgment. (Dkt. No. 136.) By order filed November 4, 2014, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Plaintiff was advised of the summary judgment procedure and the possible consequences if she failed to adequately respond to the motion. (Dkt. No. 137.) Plaintiff filed several Responses in Opposition to the Motion for Summary Judgment. (See Dkt. No. 161; Dkt. No. 164; Dkt. No. 166; see also Dkt. No. 143; Dkt. No. 144.)

**PROCEDURAL FACTS**

Plaintiff's Complaint does not contain much detail, but she alleges that on April 16, 2013, she arrived at the City of Charleston Police Department "to obtain police reports." (Dkt. No. 1 at 3 of 7.) Plaintiff alleges that she was "detained, questioned about [her] medical history, [and] forced into medical treatment." (Id.) According to Plaintiff, the "police committed assault and battery against" her and "threatened [her] with further intentional harm if [she] did not do as they wanted." (Id.) Plaintiff complains that the "police did not have a warrant or any legal court orders for any of the use of force and power against [her]," but even after the medical staff released her, the "police said [she] still had to do what they were forcing [her] to do." (Id.)

Plaintiff alleges that Defendants violated the HIPAA as well as her Fourth and Fifth Amendment rights; she also alleges Defendants "conspir[ed] against [her] rights" in violation of 18 U.S.C. § 241. (See Dkt. No. 1 at 4 of 7.) In the "Relief" section of her Complaint, Plaintiff states that she seeks monetary damages. (See Dkt. No. 1 at 5-7 of 7.)

**APPLICABLE LAW**

**Summary Judgment Motion Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" Id.

(quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)); see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

As noted above, Defendants seek summary judgment in the instant case. (Dkt. No. 136.)[1] Because Plaintiff's Complaint did not allege many factual specifics about her claims, further factual background is needed to address Defendants' motion.

**I.      Claim Related to Plaintiff's Placement in Emergency Protective Custody**

A. Plaintiff's Version of the Events[2]

Plaintiff went to the Medical University of South Carolina ("MUSC") on the morning of April 16 to find out if MUSC's clinic "could help" her because she was "distraught by [her] landlord from the day before" when the landlord "was verbally abusive" to Plaintiff; she was seeking "emotional health treatment." (Pl. Dep. 89-91.) She decided to seek help at MUSC on April 16 because when she woke up that day, she "was not over" the events of the previous day. (Pl. Dep. 91-92.) Plaintiff did not receive any treatment or medication from MUSC on the morning of April 16, and when she left MUSC on the morning of April 16, she went directly to the City of Charleston Police Department ("CPD") to obtain a copy of a police report from the day before; Plaintiff called CPD on April 15 to report her landlord's "verbal abuse." (Pl. Dep. 92-93.)

---

[1]To the extent Plaintiff seeks to bring a cause of action pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), such a claim fails because there is no private cause of action under HIPAA. See Webb v. Smart Document Solutions, LLC, 499 F.3d 1078, 1080 (9th Cir. 2007) (noting that HIPAA provides for no private right of action); Acara v. Banks, 470 F.3d 569, 571-72 (5th Cir. 2006) (same); Treece v. Winston-Wood, Civ. A. No. 3:10-2354-DCN-JRM, 2012 WL 887476, at *8 (D.S.C. Feb. 23, 2012), adopted at 2012 WL 896360 (D.S.C. Mar. 15, 2012).

[2]On March 25, 2015, the Defendants were ordered to submit a complete transcript of Plaintiff's deposition to the Court. (Dkt. No. 189.) Defendants have done so, and the undersigned has reviewed that complete transcript.

3

Plaintiff states in her deposition that she told Defendants Wilson and Dallas that she had come for a police report "about the landlord," but she also "needed a police report about the unauthorized access into [her] T-Mobile account." (Pl. Dep. 103.) Plaintiff indicates she has "no issue" with how Defendant Wilson or Defendant Dallas treated her or her case. (Pl. Dep. 104-05.) She acknowledges that she was "emotionally upset from the landlord's verbal abuse and behavior . . . from the previous day." (Pl. Dep. 105.) She also acknowledges that when Defendant Walker asked her about medications, she told him she had recently stopped taking some because of allergic reactions. (Pl. Dep. 110.)

Plaintiff stated in her deposition that when she went back out to the lobby, EMS was there, and when officers asked her to go outside, she complied, even though "[n]obody gave [her] any heads up on why the EMS was there." (Pl. Dep. 120.) No one grabbed Plaintiff or pulled her out of the police department; Plaintiff states that she "walked out of the building" with officers and EMS. (Pl. Dep. 123.) Plaintiff was confused because "in [her] mind[,] . . . [she] only need[ed] a police report." (Pl. Dep. 124; see also Pl. Dep. 110, 127-29.) According to Plaintiff, when she hesitated getting into the ambulance, Defendant Ratliffe took "his bare hands and grabbed ahold of [Plaintiff's] left shoulder and shook [her] around." (Pl. Dep. 133.) Plaintiff further describes the encounter with Ratliffe as follows:

> I mean, [Ratliffe] took his bare hands–after he threatened me, he said if I did not get into the EMS, he would physically put me in it or into a police car.
> . . .
> And then within a matter of a few seconds he took his bare hands, he grabbed ahold of my left shoulder, and he started grabbing, (indicating) shaking me around, and at that point I was–he had threatened me and put his hands on me and my handbag that was on my left shoulder. I had a water bottle in my left hand. I had a pen in my right hand. He grabbed both of those items and my pen . . . is still missing. . . .
> . . .
> And he–he kind of blinded me that–with his physical abuse of me, and there was no reason for him to do that.

4

(Pl. Dep. 133-34.) According to Plaintiff, Ratliffe grabbed her shoulder and shook her for two to three minutes–so long that she could no longer see and went "into a blackout space." (Pl. Dep. 133-34, 136, 221-22; see also Dkt. No. 143-1 at 48 of 69.) Plaintiff asserts Ratliffe "had control of [her] whole body." (Pl. Dep. 136.) No other police officer touched Plaintiff that day. (Pl. Dep. 137; see also Pl. Dep. 140.)

Once Plaintiff's evaluation at MUSC was complete, Plaintiff complains that Defendant Koegler told her that although she was not arrested, she had to get into his vehicle; Plaintiff's complaint against Koegler is that he did not give her the option of finding her own way home. (Pl. Dep. 206.) According to Plaintiff, Koegler drove Plaintiff directly back to her truck and dropped her off there. (Pl. Dep. 208.)

Plaintiff's claims against Defendants Sanders and Gant are more tenuous. Plaintiff appears to have named Sanders as a Defendant because Sanders was "present" and "visually witnessed Ratliff attack" Plaintiff. (Pl. Dep. 148, 221.) As to Defendant Gant, Plaintiff complains that Gant did not write the police report Plaintiff requested. (See Pl. Dep. 103-05, 210-11, 217.)

B. Defendants' Version of the Events

Defendants attached the Affidavit of Defendant Walker to their Motion for Summary Judgment. (See Walker Aff.) Walker states that he is currently employed as a Lieutenant with the CPD and that from January of 2013 through May of 2013, Plaintiff called the CPD twenty-nine times, mostly "regarding complaints against her neighbors and to report issues . . . Plaintiff deemed worthy of police attention." (Walker Aff. ¶¶ 2, 11.) Walker further states that on April 15, 2013, he "was called by neighbors of [Plaintiff] and was asked to come meet with them" to discuss their "concerns." (Walker Aff. ¶ 14.) According to Walker, he met with Plaintiff's neighbors, who advised him (a) "that the apartment complex had hired contractors to work on a water line and that [Plaintiff] had called the police because the

5

contractors allegedly did not have permits" and (b) "of several other incidents of irrational and irratic [sic] behavior and advised [Walker] that they were worried about their own safety." (Walker Aff. ¶¶ 16-17.) Walker states that he advised Plaintiff's neighbors that he would attempt to make contact with Plaintiff "to get her side of the story and evaluate the situation following [that] meeting." (Walker Aff. ¶ 18.)

Before Walker set up any meeting with Plaintiff, he was advised on the following day–April 16, 2013–that Plaintiff was in the lobby of CPD; Walker states that he wanted to meet Plaintiff personally "[c]onsidering the fact that [he] had just met with her neighbors the day before." (Walker Aff. ¶¶ 18-19.) Walker met with Plaintiff and asked Plaintiff's concerns; Walker states that Plaintiff "began telling [him] one issue she was having, but then would jump to another issue and then to another one." (Walker Aff. ¶ 20.) Walker indicates he spoke with Plaintiff for about fifteen minutes, during which Plaintiff "jumped between four different stories and appeared to be in an irrational emotional state." (Walker Aff. ¶ 20.) Walker further indicates that he then asked Plaintiff whether she was on any medication, and Plaintiff "advised that she was supposed to be on medication, but was not taking it because she had an allergic reaction." (Walker Aff. ¶ 21.) Walker states that he "then excused [himself] and contacted Elizabeth Spencer who is a victim's advocate for CPD." (Walker Aff. ¶ 22.) According to Walker, Ms. Spencer "was familiar with Ms. Childress and advised that Ms. Childress had a long history of mental health issues." (Walker Aff. ¶ 22.) At that point, Walker states that he and Ms. Spencer then "decided that the best course of action would be to place Ms. Childress in EPC [Emergency Protective Custody] and have her transported to MUSC for an evaluation." (Walker Aff. ¶ 22.) According to Walker, the "decision to place Ms. Childress in EPC was based on her past mental health history, her irrational emotional state, and the concern for the safety of Ms. Childress and others,

including her neighbors who had voiced concerns for their own safety the day before." (Walker Aff. ¶ 23.)

### C. Analysis

It is undisputed that Defendant Walker met with Plaintiff's neighbors on April 15, 2013, and that Plaintiff's neighbors voiced concern to Walker about Plaintiff's behavior and concern for their own safety. (Walker Aff. ¶¶ 16-17.) It is undisputed that Plaintiff sought "emotional health treatment" at MUSC on the morning of April 16, 2013 but received no medication or treatment there that morning. (Pl. Dep. 89-93.) The parties agree that after Plaintiff left MUSC, she proceeded directly to the CPD. Plaintiff asserts that she went to CPD to obtain a police report pertaining to her report the previous day about her landlord, and Defendants have not disputed that assertion.

Defendants presented evidence that Plaintiff "appeared to be in an irrational emotional state," (Walker Aff. ¶ 20; see also Ratliffe Aff. ¶¶ 4-8), and while Plaintiff believes Defendants had no reason to place her in Emergency Protective Custody, Plaintiff acknowledges that she was "emotionally upset from the landlord's verbal abuse and behavior . . . from the previous day." (Pl. Dep. 105.) In addition, it is undisputed that when Defendant Walker asked Plaintiff about her medications, she told him she had recently stopped taking some because of allergic reactions. (Pl. Dep. 110.) Defendants presented evidence that at that point, Defendant Walker contacted Ms. Spencer, a victim's advocate for CPD, and that Ms. Spencer told Walker that Plaintiff "had a long history of mental health issues." (Walker Aff. ¶ 22.) Plaintiff "does not deny having a mental & emotional health history." (Dkt. No. 143 at 3 of 4.) She also acknowledges that on April 16, 2013, she told Defendant Walker (a) that someone had broken into her residence in West Ashley and stolen one of her hats, (b) that someone broke into her truck and placed a white substance

7

on the seat, and (c) that someone broke into her home and put "the same white substance on [her] clothes." (Pl. Dep. 198-99.)

Given these undisputed facts, to the extent Plaintiff complains that Defendants had no right to place Plaintiff in Emergency Protective Custody, Plaintiff's claim fails. A civil action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

In their Motion for Summary Judgment, Defendants contend they are entitled to qualified immunity. The doctrine of qualified immunity protects governmental officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When an official properly asserts the defense of qualified immunity, the official is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established, such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009).

As to Plaintiff's complaints that Defendants had no right to place Plaintiff in Emergency Protective Custody, the undersigned recommends granting summary judgment to Defendants. Assuming, without deciding, that this claim states a violation of a constitutional right, it would not have been clear to a reasonable officer that placing Plaintiff

in Emergency Protective Custody was unlawful. Title 43, Chapter 35 of the South Carolina Code is entitled "Adult Protection" and is also known as the "Omnibus Adult Protection Act." See S.C. CODE ANN. § 43-35-5 et seq. Section 43-35-55 provides, in relevant part,

> A law enforcement officer may take a vulnerable adult in a life-threatening situation into protective custody if:
>
> (1) there is probable cause to believe that by reason of abuse, neglect, or exploitation there exists an imminent danger to the vulnerable adult's life or physical safety;
>
> (2) the vulnerable adult or caregiver does not consent to protective custody; and
>
> (3) there is not time to apply for a court order.

S.C. CODE ANN. § 43-35-55.[3] This Chapter of the South Carolina Code defines "neglect" as follows:

> "Neglect" means the failure or omission of a caregiver to provide the care, goods, or services necessary to maintain the health or safety of a vulnerable adult including, but not limited to, food, clothing, medicine, shelter, supervision, and medical services and the failure or omission has caused, or presents a substantial risk of causing, physical or mental injury to the vulnerable adult. Noncompliance with regulatory standards alone does not constitute neglect. Neglect includes the inability of a vulnerable adult, in the absence of a caretaker, to provide for his or her own health or safety which produces or could reasonably be expected to produce serious physical or psychological harm or substantial risk of death.

S.C. CODE ANN. § 43-35-10(6).

Considering the facts in the light most favorable to Plaintiff, Defendants' placement of Plaintiff in Emergency Protective Custody, transporting her to MUSC for evaluation, and then returning her to her vehicle at CPD after MUSC discharged her, did not "transgress[ a] bright line[]." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (citations omitted).

---

[3]Given this statutory provision, Plaintiff's focus on the fact that Defendants did not have a court order allowing them to place her in Emergency Protective custody is clearly misplaced.

9

Plaintiff, who had a history of mental illness known to Defendants, was emotional and told Defendants that she recently stopped taking her medication; Plaintiff's neighbors also reported–the day before the incident in question–some erratic behavior on the part of Plaintiff as well as concern for their own safety. Just as in S.P. v. City of Takoma Park, Maryland, 134 F.3d 260, 268 (4th Cir. 1998), "there was no clearly established authority available which would have notified these officers that their conduct was unlawful." See also Gooden v. Howard County, Md., 954 F.2d 960, 968-69 (4th Cir. 1992) ("The lack of clarity in the law governing seizures for psychological evaluations is striking when compared to the standards detailed in other Fourth Amendment contexts, where probable cause to suspect criminal misconduct has been painstakingly defined. Of course, the law in no way permits random or baseless detention of citizens for psychological evaluations, but that was hardly the case here. Under the circumstances, the officers were not provisioned with adequate legal guidance, and the protective measures taken by the police with regard to Ms. Gooden failed to violate a clearly established constitutional right." (citations omitted)). Accordingly, Defendants are entitled to qualified immunity on this claim, and the undersigned recommends granting summary judgment to Defendants on this claim.

## II.    **Excessive Force Claim against Ratliffe**

Plaintiff's claim against Defendant Ratliffe requires a different result. "The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). A determination of whether an officer used excessive force to effect a seizure is based on a standard of "'objective reasonableness.'" Id. (quoting Graham, 490 U.S. at 399). As stated in Jones,

> We weigh the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. This test requires us to determine the reasonableness of an officer's

10

> actions and is not capable of precise definition or mechanical application. Instead it requires careful attention to the facts and circumstances of each particular case. Those facts and circumstances include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. The extent of the plaintiff's injury is also a relevant consideration.

Jones, 325 F.3d at 527 (internal quotation marks and citations omitted).

Because Plaintiff committed no crime, the first factor "weighs heavily in [her] favor." Bailey v. Kennedy, 349 F.3d 731, 743 (4th Cir. 2003). As to the second and third factors, while reasonable officers may have viewed Plaintiff as a risk to herself, there is no evidence that Plaintiff posed an immediate threat to the safety of the officers or that she was actively trying to resist or evade placement in Emergency Protective Custody. Defendants assert that Plaintiff voluntarily complied with all of their requests; Plaintiff asserts that she hesitated to get into the ambulance because she was confused. Considering these three factors, a reasonable jury could conclude that Ratliffe used excessive force; there is a material factual dispute as to the amount of physical contact–if any–Ratliffe had with Plaintiff standing outside the ambulance. Ratliffe states in his Affidavit that he "never touched Plaintiff" (Ratliffe Aff. ¶ 12); Sanders states,

> During the time I was with [Plaintiff] at the ambulance, I am not completely certain that any officer touched Ms. Childress, but if any touching occurred, it was only to guide her toward the ambulance. By no means did I witness any officer forcing her into the ambulance.

(Sanders Aff. ¶ 11.) Plaintiff's version of events is markedly different. According to Plaintiff, Ratliffe grabbed her shoulder and shook her for two to three minutes–so long that she could no longer see and went "into a blackout space." (Pl. Dep. 133-34, 136, 221-22; see also Dkt. No. 143-1 at 48 of 69.) Given the markedly different versions of the events that occurred

11

outside the ambulance, the undersigned recommends denying Ratliffe's request for summary judgment as to Plaintiff's excessive force claim.[4]

## III.    Claim against City of Charleston Police Department

Defendants contend the CPD "is entitled to dismissal as Plaintiff has not stated a proper claim under § 1983 nor has she properly pled a claim for municipal liability." (Mem. in Supp. at 14.) The undersigned agrees with Defendants that CPD is entitled to summary judgment. Defendant CPD "cannot be held liable *solely* because it employs a tortfeasor–in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978). Pursuant to Monell, a municipality or other local government entity may be liable under § 1983 for the violation of a plaintiff's constitutional rights, but only where the constitutionally offensive actions of employees are taken in furtherance of some municipal policy or custom. See Monell, 436 U.S. at 694; see also Knight v. Vernon, 214 F.3d 544, 552 (4th Cir. 2000).

---

[4]Defendants assert in their motion that because Plaintiff was in emergency protective custody, Plaintiff's claim for excessive force should be examined pursuant to the Fourteenth Amendment. (See Mem. in Supp. at 22.) It is not clear to the undersigned the exact moment at which Plaintiff entered emergency protective custody. Regardless of whether the analysis is made pursuant to the Fourth Amendment or the Fourteenth Amendment, summary judgment should be denied as to Plaintiff's claim of excessive force against Ratliffe. To succeed on an excessive force claim under the Due Process Clause of the Fourteenth Amendment, Plaintiff must show that Defendants "inflicted unnecessary and wanton pain and suffering." Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998) (citing Whitley v. Albers, 475 U.S. 312, 320 (1991)), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010); see also Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008), abrogated on other grounds by Wilkins, 559 U.S. 34. As the Fourth Circuit stated in Orem,
> "In determining whether [this] constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).

Orem, 523 F.3d at 446. Plaintiff presented evidence which–if believed–indicates that Defendant Ratliffe shook Plaintiff for approximately two to three minutes and shook her so violently that she temporarily lost her vision. Construing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Ratliffe's use of force was constitutionally excessive, regardless of whether the analysis is pursuant to the Fourth Amendment or the Fourteenth Amendment.

The material factual dispute also precludes a finding–at least at this time–that Defendant Ratliffe is entitled to qualified immunity on this claim. However, to the extent Plaintiff sued Ratliffe in his official capacity, such a claim fails; Plaintiff is entitled only to proceed against Ratliffe in his individual capacity. See U.S. CONST. amend XI; Hafer v. Melo, 502 U.S. 21 (1991); Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989).

Plaintiff admitted in her deposition that she sued CPD because it employs various officers. (See Pl. Dep. 225-26.) Defendant CPD is therefore entitled to summary judgment.

## IV.     Claims against Defendants Wilson and Gant

Defendants Wilson and Gant are also entitled to summary judgment. In a § 1983 action, "liability is personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001); see also Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution."). Plaintiff did not specify any action or inaction on the part of these Defendants in her Complaint, and from a review of Plaintiff's deposition testimony, Plaintiff's Complaints against these Defendants appear based on the allegation that they did not write the police report Plaintiff requested. (See Pl. Dep. 103-05, 210-11, 217.) Such allegations do not rise to the level of a constitutional violation. See Jarrett v. Twp. of Bensalem, 312 F. App'x 505, 507 (3d Cir. 2009) (finding no constitutional right to correct a police report); Smith v. Patri, 99 F. App'x 497, 498 (5th Cir. 2004) ("[T]here is no right to a completely accurate police report."); Landrigan v. City of Warwick, 628 F.2d 736, 745 (1st Cir. 1980) ("[T]he mere filing of the false police reports, by themselves and without more, did not create a right of action in damages under 42 U.S.C. § 1983."); Abella v. Simon, 831 F. Supp. 2d 1316, 1341 (S.D. Fla. 2011) ("[T]here is no right to have the police write a police report."), *vacated in part on other grounds*, 482 F. App'x 522 (11th Cir. 2012); Harris v. Hardeman County, Civ. A. No. 13-1100-JDT-egb, 2013 WL 5740067, at *5 (W.D. Tenn. Oct. 22, 2013) ("[T]he Constitution is not violated by a police officer's failure to make a report . . . ."). Accordingly, Defendants Wilson and Gant are entitled to summary judgment.

**V.     Conspiracy Claim**

In her Complaint, Plaintiff alleges Defendants "conspir[ed] against [her] rights" in violation of 18 U.S.C. § 241. (See Dkt. No. 1 at 4 of 7; see also Dkt. No. 166.) Of course, 18 U.S.C. § 241 is part of the United States Criminal Code, and Plaintiff cannot bring a civil action for violations of the criminal code. See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) (a private citizen does not have a "judicially cognizable interest in the prosecution or nonprosecution of another" person); Collins v. Palczewski, 841 F. Supp. 333, 340 (D. Nev. 1993) ("Long ago the courts of these United States established that criminal statutes cannot be enforced by civil actions." (internal quotation marks and citations omitted)); see also Stanfield v. Secrest, Civ. A. No. 2:13-cv-2702-MBS-BHH, 2013 WL 7156271, at *3 (D.S.C. Dec. 13, 2013) (adopted in relevant part at 2014 WL 507266 (Feb. 6, 2014)) (noting that relief "cannot be granted" to the plaintiff under 18 U.S.C. § 241 because the plaintiff "does not have a judicially cognizable interest in the criminal prosecution of another person").

To the extent Plaintiff seeks to bring a claim for civil conspiracy pursuant to § 1983, such a claim fails. "When a complaint makes only conclusory allegations of a conspiracy and fails to demonstrate any agreement or meeting of the minds among the defendants, the court may properly dismiss the complaint." Wagner v. Hampton, Civ. A. No. 2:13-cv-02406-GRA, 2014 WL 3799267, at *9 (D.S.C. July 30, 2014) (citing Woodrum v. Woodward Cnty., 866 F.2d 1121, 1126-27 (9th Cir. 1989); Cole v. Gray, 638 F.2d 804, 811-12 (5th Cir. 1981)); see also Simmons v. Poe, 47 F.3d 1370, 1376-78 (4th Cir. 1995). Defendants are entitled to summary judgment on Plaintiff's conspiracy claim.

**CONCLUSION**

Wherefore, it is RECOMMENDED that Defendants' Motion for Summary Judgment (Dkt. No. 136) be GRANTED IN PART and DENIED IN PART. More specifically, it is recommended that the motion be denied as to Plaintiff's excessive force claim against Defendant Ratliffe in his individual capacity, and that the motion be granted in all other respects.

IT IS SO RECOMMENDED.

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

March 31, 2015
Charleston, South Carolina

**The parties' attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).