# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| TESSA RANI RAYBOURNE GIBSON CARLISLE CHILDRESS, | ) ) ) | No. 2:13-cv-01225-DCN |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER** |
| CITY OF CHARLESTON POLICE DEPARTMENT, LIEUTENANT CHITO T. WALKER, OFFICER SANDERS, OFFICER KOEGLER, SARGENT RATLIFF, D-O FNU WILSON, D-O FNU DALLAS, and D-O FNU GANT, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This matter comes before the court on United States Magistrate Judge Mary Gordon Baker's report and recommendation ("R&R") that this court grant in part and deny in part a motion for summary judgment filed by defendants City of Charleston Police Department ("CPD"), Lieutenant Chito T. Walker ("Walker"), Officer Sanders ("Sanders"), Officer Koegler ("Koegler"), Sargent Ratliffe ("Ratliffe"), D-O FNU Wilson ("Wilson"), D-O FNU Dallas ("Dallas"), and D-O FNU Gant ("Gant"), (collectively "defendants"). Specifically, the magistrate judge's R&R recommends that this court deny defendants' motion for summary judgment only as to plaintiff Tessa Rani Raybourne Gibson Carlisle Childress's ("Childress") excessive force claim against Ratliffe in his individual capacity. For the reasons set forth below, the court adopts in part and rejects in part the R&R and grants defendants' motion for summary judgment in all respects.

1

# I.  BACKGROUND[1]

Childress, proceeding pro se and in forma pauperis, filed this action pursuant to 42 U.S.C. § 1983 on May 6, 2013.  Childress alleges that defendants violated her Fourth and Fifth Amendment[2] rights when they took her into emergency protective custody against her will on April 16, 2013.  Childress further alleges that defendants violated the Health Insurance Portability and Accountability Act ("HIPAA")[3] and that defendants "conspir[ed] against [her] rights" in violation of 18 U.S.C. § 241.  See Pl.'s Compl. 4.

Childress alleges that she went to the Medical University of South Carolina ("MUSC") on the morning of April 16, 2013 seeking "emotional health treatment."  Pl.'s Dep. 89:22–91:3.  She claims that she was "distraught by [her] landlord from the day before" when he was "verbally abusive" towards her.  Id. at 90:9–90:22.  On April 15, 2013, the day prior to the events in question, Childress called CPD to report her landlord's "verbal abuse."  Id. at 92:1–93:9.  After the incident, she decided to seek help at MUSC because she "was not over" the events of the previous day.  Id.  Childress did not receive treatment or medication while at MUSC.  Id. at 92:16–92:19.  After leaving

---

[1]    The following facts are considered in the light most favorable to the non-moving party, Childress. See Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

[2]    In addition to claiming a Fourth Amendment violation, Childress claims that defendants violated her Fifth Amendment right to be free from compulsory self-incrimination when they failed to read her Miranda rights.  See ECF No. 164, Pl.'s Objections 1–4.  However, this claim is without merit and will not warrant further analysis.  The Fifth Amendment privilege and recitation of Miranda rights serve to protect persons from being compelled to incriminate themselves.  Miranda v. Arizona, 384 U.S. 436, 467 (1966).  Childress was not arrested, and no criminal charges were ever filed against her.  Thus, defendants clearly did not violate Childress's Fifth Amendment rights.

[3]    To the extent Childress seeks to bring a cause of action pursuant to HIPAA, such a claim fails because there is no private cause of action under HIPAA.  See, e.g., Sneed v. Pan Am. Hosp., 370 F. App'x 47, 50 (11th Cir. 2010) ("HIPAA contains no express provision creating a private cause of action."); Harrison v. Univ. of Colo. Health Scis. Ctr., 337 F. App'x 750, 754 (10th Cir. 2009) (same); Adams v. Eureka Fire Protection Dist., 352 F. App'x 137, 139 (8th Cir. 2009) (same); Webb v. Smart Document Sols., LLC, 499 F.3d 1078, 1080 (9th Cir. 2007) (same); Acara v. Banks, 470 F.3d 569, 571 (5th Cir. 2006) (same); Treece v. Winston-Wood, No. 3:10-cv-2354, 2012 WL 887476, at *8 (D.S.C. Feb. 23, 2012) (same).

2

MUSC, Childress claims she went directly to CPD to obtain a copy of the police report relating to the incident from the prior day.  Id. at 92:25–93:5.  Upon arriving at CPD, Childress informed Wilson and Dallas that she had come for a police report "about the landlord," but that she also "needed a police report about the unauthorized access into [her] T-Mobile account."  Id. at 103:2–11.  Childress acknowledges that, while at CPD, she was "emotionally upset from the landlord's verbal abuse . . . from the previous day." Id. at 105:7-16.

Walker states that from January 2013 to May 2013, Childress had called CPD twenty-nine times, mostly "regarding complaints against her neighbors and to report issues [Childress] deemed worthy of police attention."  Walker Aff. ¶¶ 2, 11.  Walker further states that on April 15, 2013, he "was called by neighbors of [Childress] and was asked to come meet with them" to discuss their "concerns."  Id. at ¶ 14.  According to Walker, he met with Childress's neighbors, who discussed "several . . . incidents of [Childress's] irrational and [e]rratic behavior and advised [Walker] that they were worried about their own safety."  Id. at ¶¶ 16–17.  Walker states that he informed Childress's neighbors that he would meet with her to discuss these complaints.  Id. at ¶ 18.  When CPD officials informed Walker that Childress was in CPD's lobby, he decided to meet with Childress personally, especially "[c]onsidering the fact that [he] met with her neighbors the day before."  Id. at ¶¶ 18–19.

Walker met with Childress in the lobby for about fifteen minutes during which time they discussed her concerns.  Walker claims that Childress "began telling [him] one of the issues she was having, but then would jump to another issue and then to another one."  Id. at ¶ 20.  During the conversation, Walker states that Childress "jumped

3

between four different stories and appeared to be in an irrational emotional state." Id. Childress testified that she told Walker that someone had broken into her residence and stolen one of her hats, that someone broke into her truck and placed a "white substance" on the seat, and that someone broke into her home and put the "same white substance on [her] clothes." Pl.'s Dep. 198:15–200:2.

Walker then asked Childress if she was on any medication, to which Childress responded that she was "advised that she was supposed to be on medication, but was not taking it because she had an allergic reaction." Walker Aff. ¶ 21. Walker then excused himself and contacted Elizabeth Spencer ("Ms. Spencer"), a victim's advocate at CPD. Id. at ¶ 22. According to Walker, Ms. Spencer "was familiar with [Childress] and advised that [Childress] had a long history of mental health issues." Id. At that point, Walker stated that he and Ms. Spencer "decided that the best course of action would be to place [Childress] in [protective custody] and have her transported to MUSC for an evaluation." Id. According to Walker, the decision to place Childress in protective custody "was based on her past mental health history, her irrational emotional state, and the concern for the safety of [Childress] and others, including her neighbors who ha[d] voiced concerns for their own safety the day before." Id. at ¶ 23.

Childress alleges that CPD officers asked her to go outside, and she complied even though "[n]obody gave [her] any heads up on why the EMS was there." Pl.'s Dep. 120. Childress does not allege that CPD officers forced her to go outside, but states that she was confused because "in [her] mind[,] . . . [she] only need[ed] a police report." Id. at 124:15–21; see also id. at 127–29. According to Childress, when she hesitated getting into the ambulance, Ratliffe "took his bare hands and grabbed ahold of [Childress's] left

4

shoulder and shook [her] around." Id. at 133:1–25.  Childress further describes her

encounter with Ratliffe as follows:

> I mean, [Ratliffe] took his bare hands—after he threatened me, he said if I
> did not get into the EMS, he would physically put me in it or into a police
> car. . . .  And then within a matter of a few seconds he took his bare hands,
> he grabbed ahold of my left shoulder, and he started grabbing, shaking me
> around, and at that point I was—he had threatened me and put his hands
> on me and my handbag that was on my shoulder.  I had a water bottle in
> my left hand.  I had a pen in my right hand.  He grabbed both of those
> items and my pen . . . is still missing. . . .  And he—he kind of blinded me
> that—with his physical abuse of me, and there was no reason for him to do
> that.

Id. at 133–34.  According to Childress, Ratliffe grabbed her left shoulder and shook her

for two to three minutes and, as a result, she could no longer see and went "into a

blackout space."  Id.   Childress maintains that no other CPD officer touched her that day,

Id. at 137:19–22; however, she does claim that Sanders and Walker were present and

"visually witnessed Ratliff[e] attack" her, id. at 221:14–24.  Ratliffe, Sanders, and

Walker all deny that Ratliffe used force to get Childress into the ambulance.

       EMS took Childress to MUSC for a medical evaluation.  Childress did not report

any injuries from the alleged encounter with Ratliffe to EMS nor to MUSC health care

providers.  MUSC personnel took blood and urine samples and released Childress.  Once

Childress's evaluation at MUSC was complete, she claims that Koegler told her that

although she was not arrested, she had to get into his police cruiser.  Id. at 206:14–25.

Childress complains that Koegler did not give her the option of finding her own way

home.  Id.  Koegler took Childress directly to her car at CPD.  Id. at 208:1–24.  After she

arrived back at CPD, Childress again tried to get a police report.  Id.  As to Gant, Dallas,

and Wilson, Childress complains that they did not write the police report that Childress requested.  See id. at 103–05, 210–11, 217.

Defendants filed a motion for summary judgment on October 31, 2014.  Childress filed three responses in opposition to defendants' motion on December 3, December 10, and December 12, 2014.  On March 31, 2015, the magistrate judge issued the R&R, recommending that this court grant in part and deny in part defendants' motion for summary judgment.  Childress filed numerous objections to the R&R on April 7, April 8, April 9, April 10, and April 14, 2015.  On April 17, 2015, Ratliffe filed objections to the R&R.  The matter is now ripe for the court's review.

## II.  STANDARD

This court is charged with conducting a de novo review of any portion of the magistrate judge's report to which specific, written objections are made, and may accept, reject, or modify, in whole or in part, the recommendations contained in that report.  28 U.S.C. § 636(b)(1).  The magistrate judge's recommendation does not carry presumptive weight, and it is the responsibility of this court to make a final determination.  Mathews v. Weber, 423 U.S. 261, 270–71 (1976).  A party's failure to object may be treated as agreement with the conclusions of the magistrate judge.  See Thomas v. Arn, 474 U.S. 140, 150 (1985).

Childress appears pro se in this case.  Federal district courts are charged with liberally construing complaints filed by pro se litigants to allow the development of a potentially meritorious case.  See Haines v. Kerner, 404 U.S. 519, 521 (1972).  The requirement of liberal construction does not mean that the court can ignore a clear failure

6

in the pleadings to allege facts that set forth a cognizable claim, nor does it mean the court can assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

Summary judgment shall be granted if the movant shows that there is no genuine dispute as to any issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the ECF of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. Id. at 255.

## III. DISCUSSION

### A. Childress's Objections

As stated above, Childress filed numerous written objections to the magistrate judge's R&R. To the extent that the court can interpret the objections, each will be discussed in turn. As outlined fully below, after review of Childress's objections in conjunction with the magistrate judge's R&R and the entirety of the record, Childress's objections are without merit.[4]

---

[4] The court ordered defendants to submit a complete copy of Childress's deposition on March 25, 2015. The deposition is filed under seal. See ECF No. 186. The court has reviewed the deposition transcript.

7

**1.  Emergency Protective Custody.**

Construing Childress's objections liberally, it appears that she broadly objects to the magistrate judge's recommendation that CPD officials had the authority to place her into emergency protective custody and that doing so did not violate her Fourth Amendment right to be free from unreasonable seizures.  <u>See generally</u> Pl.'s Objections.[5] However, considering the evidence and all justifiable inferences therefrom in the light most favorable to Childress, defendants did not violate Childress's rights by taking her into emergency protective custody.

Title 44, Chapter 13 of the South Carolina Code provides, in pertinent part:

> If a law enforcement officer observes a person conducting himself in a manner that causes the law enforcement officer to reasonably believe that the person is mentally ill or is suffering from a chemical dependency and because of that condition poses a likelihood of serious harm to himself or others . . . , the law enforcement officer may take the person into protective custody and transport the person to the local mental health center . . . for examination and . . . evaluation of psychiatric and chemical dependency emergencies.

S.C. Code Ann. § 44-13-05(A) (2005).[6]

When Childress arrived at CPD, she appeared to be in an "irrational emotional state," Walker Aff. ¶ 20; Ratliffe Aff. ¶¶ 4–8, and had attempted to seek "emotional health treatment" from MUSC immediately before she came to the police department, Childress's Dep. 89–93.  Childress herself admits that she was "distraught" and "not

---

[5]    Childress alleges that:  (1) CPD had no right to place her into protective custody; (2) CPD officials failed to follow procedural guidelines in placing her into protective custody; (3) CPD did not have an arrest or search warrant before placing her into protective custody; (4) CPD officers kidnapped her; and (5) that CPD officers performed no medical evaluation of Childress before placing her into protective custody.  <u>See</u> Pl.'s Objections.

[6]    Given this statutory provision, Childress's objection that CPD officials did not have a warrant before placing her into protective custody is meritless.  In fact, "the taking of a person into protective custody . . . is not an arrest."  S.C. Code Ann. § 44-13-05(D).

over" the prior day's events.  Id. at 89–92.  Childress also admits that she was "emotionally upset from the landlord's verbal abuse and behavior . . . from the previous day."  Id. at 110.  It is undisputed that Childress has a long history of mental health and emotional issues, and that CPD officials knew of her mental health issues.  Further, Childress called CPD twenty-nine times about relatively minor issues in a span of only four months.  Walker Aff. ¶¶ 2, 11.  Ms. Spencer, a victim's advocate for CPD, was familiar with Childress and her medical history and advised CPD officials of her mental health and emotional issues on the day of the incident.  Id. at ¶ 22.  Additionally, Childress informed Walker that she usually takes medication, but had stopped taking her medication in response to an allergic reaction.  Pl.'s Dep. 110.  Walker also stated that due to her erratic behavior, Childress's neighbors feared for their safety and reported their fears to Walker the previous day.  Walker Aff. ¶¶ 16–17.

Given Childress's erratic demeanor at CPD, her long history of mental and emotional instability, her decision to stop taking her medication, and her neighbors expressing their concerns for their own safety, it was entirely reasonable for CPD officials to take Childress into emergency protective custody.  The information available to CPD officials at the time they took her into protective custody would lead a "law enforcement officer to reasonably believe that [Childress] is mentally ill or is suffering from a chemical dependency and because of that condition poses a likelihood of serious harm to [herself] or others."  S.C. Code Ann. § 44-13-05(A).  CPD officials complied with the statute when they placed Childress in protective custody.  As such, any and all objections relating to CPD officials' authority, or lack thereof, to take her into protective custody are without merit.

9

Further, to the extent that the officers' decision to take Childress into emergency protective custody violated her Fourth Amendment Rights, the officers are entitled to qualified immunity. The officers were acting in reliance on a valid state statute. Based on the information available to them, Childress's condition presented a likelihood of harm to herself. Given "[t]he lack of clarity in the law governing seizures for psychological evaluations," under these circumstances, "the officers were not provisioned with adequate legal guidance, and the protective measures" the officers took did not violate a clearly established constitutional right. Gooden v. Howard County, Md., 954 F.3d 960, 968–69 (4th Cir. 1992). "[T]here is no clearly established authority available which would have notified these officers that their conduct was unlawful." S.P. v. City of Takoma Park, Md., 134 F.3d 260, 268 (4th Cir. 1998). When viewed in the light most favorable to Childress, the officers' decision to take her into protective custody and all the actions taken relating to her time in protective custody do not "transgress[] [a] bright line[]." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (internal citations omitted).

## 2. Vicarious Liability

In her complaint, Childress failed to specify any action or inaction on the part of Sanders and Walker, except that they were both present and "visually witnessed Ratliff[e] attack" her. Pl.'s Dep. 148, 221. However, plaintiffs may not recover under a vicarious liability theory in an action pursuant to 42 U.S.C. § 1983, because "liability is personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 401 (4th Cir. 2001). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own

10

actions, has violated the Constitution." Ashcroft v. Iqbal, 55 U.S. 662, 676 (2009). As such, Sander's and Walker's mere presence does not subject them to liability under 42 U.S.C. § 1983, and they are therefore entitled to summary judgment.

### 3. Claims against CPD

Childress also named CPD as a defendant. Local government entities are "persons" to whom 42 U.S.C. § 1983 applies. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978). Thus, such entities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id. However, municipal liability cannot lie "solely because it employs a tortfeasor—in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory. Id. at 691.

A government entity may only be sued under 42 U.S.C. § 1983 for the violation of a plaintiff's constitutional rights, but only where the constitutionally offensive actions of employees are taken in furtherance of some municipal policy or custom. See id. at 694; see also Knight v. Vernon, 214 F.3d 544, 552 (4th Cir. 2000). Childress admits in her own deposition that she sued CPD because it employs the officer defendants. See Pl.'s Dep. 225–26. Because Childress is suing CPD on a respondeat superior theory, such a claim is improper under 42 U.S.C. § 1983, and CPD is therefore entitled to summary judgment.

11

### 4. Claims against Wilson, Gant, and Dallas

Childress's allegations against Wilson, Gant, and Dallas appear to relate to their failure to provide a police report to Childress upon her request when she arrived at CPD on April 16, 2013.  See Pl.'s Dep. 103–05, 210–11, 217.  Such allegations, however, do not amount to a constitutional violation, and, therefore, Wilson, Gant, and Dallas are entitled to summary judgment.

Courts have held that there is no constitutional right to an accurate police report. See Jarrett v. Twp. of Bensalem, 312 F. App'x 505, 507 (3d Cir. 2009) ("[T]he mere existence of an allegedly incorrect police report fails to implicate constitutional rights."); Smith v. Patri, 99 F. App'x 497, 498 (5th Cir. 2004) ("[T]here is no right to a completely accurate police report.");  Landrigan v. City of Warwick, 628 F.2d 736, 745 (1st Cir. 1980) ("[T]he mere filing of the false reports, by themselves and without more, did not create a right of action in damages under 42 U.S.C. § 1983.").  Courts have further found that there is in fact no constitutional right to a police report.  See Harris v. Hardeman Cnty., 2013 WL 5740067, at *1, *4 (W.D. Tenn. Oct. 22, 2013) ("[T]he Constitution is not violated by a police officer's failure to make a report . . . ."); Abella v. Simon, 831 F. Supp. 2d 1316, 1341 (S.D. Fla. 2011) vacated in part on other grounds, 482 F. App'x 522 (11th Cir. 2012) ("[T]here is no right to have the police write a police report."), vacated in part on other grounds, 482 F. App'x 522 (11th Cir. 2012).  Accordingly, Wilson, Gant, and Dallas's alleged failure to provide a police report upon Childress's request does not rise to a cognizable claim under 42 U.S.C. § 1983.  Therefore, Wilson, Gant, and Dallas are entitled to summary judgment.

12

### 5.  Conspiracy Claim

In her complaint, Childress alleges that defendants "conspir[ed] against [her]

rights" in violation of 18 U.S.C. § 241.  Pl.'s Compl. 4.  Section 241 is a criminal

conspiracy statute.  It reads as follows:

> If two or more persons conspire to injure, oppress, threaten, or intimidate
> any citizen in the free exercise or enjoyment of any right or privileges
> secured to him by the Constitution or laws of the United States, or because
> of his having so exercised the same; or
>
> If two or more persons go in disguise on the highway, or on the premises
> of another, with intent to prevent or hinder his free exercise or enjoyment
> of any right or privilege, so secured—
>
> They shall be fined under this title or imprisoned not more than ten years,
> or both; and . . . if such acts include kidnapping or an attempt to
> kidnap . . . they shall be fined under this title or imprisoned for any term of
> years or for life, or both, or may be sentenced to death.

18 U.S.C. § 241 (1996).

Title 18 U.S.C. § 241 is part of the United States Criminal Code, and Childress

cannot bring a civil action for alleged violations of the criminal code.  See Linda R.S. v.

Richard D., 410 U.S. 614, 619 (1973) (a private citizen does not have a "judicially

cognizable interest in the prosecution or nonprosecution of another");  Collins v.

Palczewski, 841 F. Supp. 333, 340 (D. Nev. 1993) ("Long ago the courts of the United

States established that criminal statutes cannot be enforced by civil actions." (internal

quotation marks omitted));  Stanfield v. Secrest, No. 2:13-cv-2702, 2013 WL 7156271, at

*3 (D.S.C. Dec. 13, 2013) (noting that relief "cannot be granted" to plaintiff under 18

U.S.C. § 241 because plaintiff "does not have a judicially cognizable interest in the

criminal prosecution of another person").

To the extent that Childress seeks to bring a claim for civil conspiracy pursuant to 42 U.S.C. § 1985(3), her civil conspiracy claim also fails. To establish a civil conspiracy under 42 U.S.C. § 1985(3), Childress must present evidence that defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Childress's deprivation of a constitutional right, in this case the right to be free from unreasonable searches and seizures. Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 421 (4th Cir. 1996). Plaintiffs who assert civil rights conspiracy have a weighty burden: while plaintiffs need not produce direct evidence of meeting of the minds, they must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared some conspiratorial objective. See id.

Furthermore, "to avoid evisceration of the purposes of qualified immunity, courts have required that plaintiffs alleging unlawful intent in conspiracy claims under §1985(3) . . . plead specific facts in a nonconclusory fashion to survive a motion to dismiss." Simmons v. Poe, 47 F.3d 1370, 1377 (4th Cir. 1995). "When a complaint makes only conclusory allegations of conspiracy and fails to demonstrate any agreement or meeting of the minds among the defendants, the court may properly dismiss the complaint." Wagner v. Hampton, No. 2:13-cv-02406, 2014 WL 3799267, at *9 (D.S.C. July 30, 2014).

Here, Childress failed to demonstrate any evidence, direct or circumstantial, that defendants agreed to deprive Childress of her constitutional rights. In her objections to the R&R, Childress merely quotes the civil conspiracy statute verbatim. Childress's bare assertions that defendants conspired to violate her constitutional rights are insufficient to

survive summary judgment.  As such, all defendants are entitled to summary judgment on Childress's conspiracy claim.

**B.      Ratliffe's Objections**

Ratliffe objects to the magistrate judge's recommendation that this court find that Ratliffe is not entitled to summary judgment.  Specifically, Ratliffe argues that he is entitled to qualified immunity because the law is not clearly established.  Ratliffe further argues that Childress has failed to provide any evidence beyond her conclusory allegations to support her claims.  Viewing the evidence and all justifiable inferences therefrom in the light most favorable to Childress, there is no genuine dispute as to whether Ratliffe used excessive force.  As such, Ratliffe is entitled to qualified immunity.

**1.      Qualified Immunity**

The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  The purpose of the qualified immunity defense is to "give government officials a right, not merely to avoid standing trial, but also to avoid the burdens of such pretrial matters as discovery, as inquiries of this kind can be peculiarly disruptive of effective government."  Behrens v. Pelletier, 516 U.S. 299, 308 (1996) (quotations omitted).  "Qualified immunity provides 'an immunity from suit rather than a

15

mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" <u>Cloaninger ex rel. Estate of Cloaninger v. McDevitt</u>, 555 F.3d 324, 330 (4th Cir. 2009) (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, (1985)). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam).

"In determining whether an officer is entitled to summary judgment on the basis of qualified immunity, courts engage in a two-pronged inquiry." <u>Smith v. Ray</u>, 781 F.3d 95, 100 (4th Cir. 2015). The two prongs of the qualified immunity test may be applied in any sequence. <u>Pearson</u>, 555 U.S. at 236 (courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). "[U]nder either prong, courts may not resolve <u>genuine</u> disputes of fact in favor of the party seeking summary judgment." <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014) (emphasis added).

The first prong asks "whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a federal right." <u>Ray</u>, 781 F.3d at 100. An officer's alleged use of excessive force during an arrest or investigation implicates the Fourth Amendment right against unreasonable seizures. <u>Id.</u>

"The second prong of the qualified-immunity inquiry asks whether the right was clearly established at the time the violation occurred such that a reasonable person would have known that his conduct was unconstitutional." <u>Id.</u> "'We do not require a case directly on point' in order to conclude that the law was clearly established so long as 'existing precedent [has] placed the statutory or constitutional question beyond debate.'"

16

Id. (quoting Ashcroft v. al–Kidd, 131 S.Ct. 2074, 2083 (2011)).  "To be clearly

established, a right must be sufficiently clear 'that every reasonable official would [have

understood] that what he is doing violates that right.'  In other words, 'existing precedent

must have placed the statutory or constitutional question beyond debate.'"  Reichle v.

Howards, 132 S.Ct. 2088, 2093 (2012) (quoting Ashcroft, 131 S.Ct. at 2078) (some

internal quotation marks and citations omitted)).

  "A claim that a police officer employed excessive force is analyzed under the

Fourth Amendment's 'objective reasonableness' standard."[7] Ray, 781 F.3d at 100–101

(citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)); see also Tolan v.

Cotton, 134 S. Ct. 1861, 1865 (2014) ("When a plaintiff alleges excessive force during an

investigation or arrest, the federal right at issue is the Fourth Amendment right against

unreasonable seizures." (citing Graham v. Connor, 490 U.S. 386, 394 (1989))).  The

officer's alleged conduct is not excessive if it is "'objectively reasonable' in light of the

facts and circumstances confronting [him], without regard to [his] underlying intent or

motivation."  Id. at 101 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).  In

---

[7] Ratliffe argues that the proper standard to apply is the Fourteenth Amendment's "in custody" standard and not the Fourth Amendment standard because Childress was already in emergency protective custody at the time of the alleged incident.  Defs.' Objections 6.  As stated above, "[w]hen a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures."  Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014) (citing Graham v. Connor, 490 U.S. 386, 394 (1989) (emphasis added)).  Therefore, the court finds that the magistrate judge applied the proper standard.  However, assuming arguendo that the Fourteenth Amendment standard applies, Ratliffe would also be entitled to qualified immunity.  Under the Fourteenth Amendment standard, a plaintiff must show that an officer applied force "maliciously and sadistically for the very purpose of causing harm."  Id. (citing Whitley v. Albers, 475 U.S. 312, 320 (1986)).  Childress alleges that Ratliffe shook her for two to three minutes and caused her to temporarily lose her vision.  However, as outlined below, the evidence in the record does not support Childress's allegations.  Viewing the facts in the light most favorable to Childress, a reasonable jury could not determine that Ratliffe used force "maliciously and sadistically for the very purpose of causing harm."  Therefore, Ratliffe would be entitled to qualified immunity under the Fourth or the Fourteenth Amendment standard.

considering the reasonableness of an officer's actions, a court "must consider the facts at the moment that the challenged force was employed." Id.

Analyzing the reasonableness of an officer's alleged actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted). A court must also give "careful attention to the facts and circumstances of each particular case, including" three factors in particular: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "Ultimately, the question to be decided is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" Ray, 781 F.3d at 101 (quoting Tennessee v. Garner, 471 U.S. 1, 8–9 (1985).

"Ordinarily, no factual findings are necessary to the analysis of a qualified immunity claim because the 'issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law.'" Estate of Cloaninger, 555 F.3d at 331 (quoting Mitchell, 472 U.S. at 528 n. 9). However, the Fourth Circuit has held that "defendants may still contest on a motion for summary judgment the adequacy of the plaintiff's evidence to support the allegations in his complaint." Id. "Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine

issue as to whether the defendant in fact committed those acts." Mitchell, 472 U.S. at

526.

The Fourth Circuit engaged in an extensive analysis of the procedural framework

for evaluating a claim of qualified immunity, stating that

> when the defendant in a § 1983 action raises a qualified immunity defense,
> the court ordinarily assesses whether the plaintiff's complaint states
> sufficient factual allegations that, if true, show a violation of clearly
> established constitutional rights.  To do so, the plaintiff's complaint must
> allege conduct a reasonable officer would know to be unlawful.
> However, when there has been discovery and the   defendants challenge
> through a motion for summary judgment the sufficiency of the   plaintiff's
> evidence to support the allegations of his complaint, including his
> description of their conduct, an evaluation of the complaint's sufficiency
> is unnecessary and may unduly prolong the defendants' entanglement in
> litigation if the court can determine that the plaintiff's evidence does not
> support his allegations.  In that circumstance, the familiar standard for
> summary judgment under Rule 56 applies.

Estate of Cloaninger, 555 F.3d at 331 (emphasis added).  Therefore, "[a]t the summary

judgment stage, facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372

(2007) (quoting Fed. R. Civ. P. 56(c)).

Ratliffe presented both a legal claim of qualified immunity and an evidentiary

challenge to Childress's allegations in the motion for summary judgment and objections

to the R&R.  Viewing the facts in the light most favorable to Childress, it is clear that

Ratliffe did not violate Childress's Fourth Amendment rights.  According to Childress,

Ratliffe grabbed her shoulder and shook her violently for two to three minutes, causing

her to temporarily lose her vision.  However, a review of the entire record reveals a much

different account of the events that took place on April 16, 2013.  The record is entirely

void of any evidence from which a reasonable jury could determine that Ratliffe

19

employed excessive force against Childress.  Ratliffe contends that he never touched Childress and that "[t]he most [he] did was hand her the bags she had so that she could take them with her in the ambulance."  Ratliffe Aff. ¶ 12.  Walker's account of the events that took place on April 16, 2013 corroborates Ratliffe's description of the incident.  Walker states that "[a]t no point did [he] see any CPD officers force Childress into the ambulance or touch her in any way."  Walker Aff. ¶ 28.  Similarly, Sanders's account of the April 16, 2013 incident further corroborates Ratliffe's defense.  Sanders states that "I am not completely certain that any officer touched Ms. Childress, but if any touching occurred, it was only to guide her toward the ambulance.  By no means did I witness any officer forcing her into the ambulance."  Sanders Aff. ¶ 11.

Further, if Ratliffe had in fact shaken Childress for two to three minutes and caused her to temporarily lose her vision, there would be some medical evidence to support her claims.  EMS personnel evaluated Childress during her transport to MUSC.  The EMS Report states that Childress "has no complaint of [h]ead, [n]eck, [c]hest, [a]bdominal or [b]ack pain, weakness, dizziness [sic], nausea, or vomiting."  ECF No. 186, filed under seal.  The Report further states that "[t]ransport occurred without incident."  Id.  MUSC personnel also evaluated Childress once she arrived at the hospital.  Her medical records lack any indication that Childress complained of any injuries or complained of any loss of vision.  The medical records also do not indicate that Childress complained of any pain in her shoulder or any other part of her body.  Therefore, there is no genuine dispute of fact regarding whether Ratliffe used force as Childress alleges.

Additionally, the Graham factors weigh in Ratliffe's favor.  Childress admits that she hesitated to get in the ambulance because she was confused.  Although it is

undisputed that Childress was unarmed and had not committed a crime, CPD officers reasonably believed that Childress's condition posed an immediate threat to her safety and the safety of others.  Childress had stopped taking her medication and had an extensive mental health history.  Childress acted erratically at CPD, and she admits that she was emotional and distraught.  On the day before the incident in question, Childress's neighbors reported to CPD officials that they feared for their safety.

Lastly, the South Carolina protective custody statute provides that "a law enforcement officer taking an individual into protective custody may use that kind and degree of force necessary, including reasonable precautions for self-protection."  S.C. Code Ann. § 44-13-05(D).  The statute further provides that "[e]xcept when a person is injured as a result of intentional injury, gross negligence, or a wanton disregard for their personal safety, a law enforcement officer . . . who acts in accordance with this section is immune from civil liability."  Id. § 44-13-05(E).  Therefore, Ratliffe had authorization from a valid state statute to use "that kind and degree of force necessary" to put Childress in protective custody.

There is absolutely no evidence that Ratliffe's conduct was objectively unreasonable under the circumstances.  To the extent that Ratliffe did place his hand on Childress's shoulder to guide her into the ambulance, the court finds such conduct reasonable under the circumstances.  Because Childress's evidence on summary judgment fails to establish any objectively unreasonable conduct, she cannot prove that Ratliffe violated a clearly established constitutional right.  Thus, qualified immunity bars Childress's suit against Ratliffe and summary judgment is proper.  See Estate of Cloaninger, 555 F.3d at 330–33 (holding that officers were entitled to qualified immunity

21

when the plaintiff failed to establish sufficient evidence of objectively unreasonable

conduct).[8]

## IV.   CONCLUSION

For the reasons set forth above, the court **ADOPTS** in part and **REJECTS** in part

the magistrate judge's R&R and **GRANTS** defendants' summary judgment motion.  In

light of the court's ruling, Childress's motion in limine is deemed **MOOT**.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 8, 2015**
**Charleston, South Carolina**

---

[8]    To the extent Childress brings claims against Ratliffe or the other defendants in their official capacities, her claims are barred by the Eleventh Amendment.  See U.S. Const. amend XI; Hafer v. Melo, 502 U.S. 21 (1991); Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." (citing Brandon v. Holt, 469 U.S. 464, 471 (1985))).

22